**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**NANCY J. COWGER,**

   **Plaintiff,**

**v.**             **Civil Action No.: 2:10-CV-41**
                 **JUDGE MAXWELL**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [19], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [14],
AND AFFIRM THE RULING OF THE COMMISSIONER**

## I.  INTRODUCTION

On March 25, 2010, Plaintiff Nancy J. Cowger ("Plaintiff"), by counsel Joyce H. Morton,

Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant

Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant

to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF

No. 1)  On May 24, 2010, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant

United States Attorney, filed an answer and the administrative record of the proceedings. (Answer,

ECF No. 9; Administrative Record, ECF No. 10)  On July 21, 2010, and September 10, 2010,

Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Motion

for Summ. J., ECF No. 14; Def.'s Motion for Summ. J., ECF No. 19)  Following review of the motions by the parties and administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

A.    Procedural History

On May 10, 2007,[1] Plaintiff applied for supplemental security income ("SSI"), alleging disability beginning January 1, 2005.  (R. at 182-89)  Plaintiff's claim was initially denied on July 13, 2007, and denied again upon reconsideration on December 28, 2007.  (R. at 135-39, 141-43)  On February 25, 2008, Plaintiff filed a written request for a hearing, which was held before a United States Administrative Law Judge ("ALJ") on February 4, 2009, in Morgantown, West Virginia.  (R. at 42-86, 150-52)  On April 3, 2009, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act.  (R. at 29-37)  On January 28, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-4)  Plaintiff now requests judicial review of the ALJ decision denying her application for disability.

B.    Personal History

Plaintiff Nancy J. Cowger was born June 15, 1960, and was 46 years old at the time she

---

[1]The ALJ's decision lists April 20, 2007, as the date that Plaintiff filed her claim.  (R. at 29)  However, Plaintiff's application, listed as Exhibit 1D in the Administrative Record, references a date of May 10, 2007.  (R. at 182)  The only mention of April 20, 2007 in the application refers to Plaintiff's "fugitive felon/parole or probation violator status" as of that date. (R. at 183)

initially applied for disability insurance benefits. (R. at 50, 182) Plaintiff is a high school graduate and completed two years of college. (R. at 52) Plaintiff is the mayor of Camden-on-Gauley, West Virginia, and serves on the town's sewer and water boards. (R. at 53) Plaintiff is divorced, has four children, and four grandchildren. (R. at 51, 69)

C.     Medical History

Plaintiff's relevant medical history begins with a series of joint replacement surgeries. On June 22, 2005, William R. Carson, M.D., performed a total right knee replacement on Plaintiff. (R. at 117-18, 498) An X-ray of Plaintiff's knee, taken on June 23, 2005, showed good placement of the prosthesis, and by July 5, 2005, Dr. Carson reported that Plaintiff was doing exceedingly well and had no complaints, walking without a walker and showering. (R. at 88, 504)

On August 4, 2005, Plaintiff visited Dr. Carson for a preoperative visit for a total left hip replacement. (R. at 90) Dr. Carson noted that Plaintiff was doing remarkably well, but that she has severe end stage osteoarthritis in her left hip. (R. at 90) On August 17, 2005, Plaintiff underwent a total left hip replacement. (R. at 93-94) On August 20, 2005, Dr. Carson reported that Plaintiff's postoperative recovery was going well, that her pain was controlled with Percocet, and that she was nearly independent with a 4-point walker. (R. at 95)

On December 13, 2005, Dr. Carson reported that Plaintiff would undergo a total left knee replacement because of debilitating osteoarthritis. (R. at 103) On January 11, 2006, Plaintff underwent a total left knee replacement. (R. at 104-05) Plaintiff was discharged on January 20, 2006, with weight bearing "as tolerated" on the left side. (R. at 106)     On March 2, 2006, Dr.

Carson reported that Plaintiff had done well with therapy, but still had some gait abnormality regarding her hip and recommended continued physical therapy at home. (R. at 108)

On May 4, 2006, Dr. Carson reported that Plaintiff's gait had returned to normal, and that she was losing weight. (R. at 109) Dr. Carson also reported that Plaintiff was taking Flexeril intermittently to treat back spasms. (R. at 109)

On May 16, 2006, Dr. Carson stated that Plaintiff had persistent pain in her neck, increased tingling in her fingers, and that her hands were getting weaker. (R. at 110) On June 3, 2006, an MRI was taken of Plaintiff's cervical spine, which was interpreted as showing prominent degenerative disk disease, upper ostosis of the facet joints, neural foraminal narrowing of C3 down to C6, herniated disk at the C5-C6 level, and spinal stenosis with anterior cord flattening at C5-C6. (R. at 111) Dr. Carson stated that the problem was progressive since first evaluated in 2001 and that conservative treatment had failed to relieve Plaintiff's symptoms. (R. at 111) Dr. Carson recommended surgery. (R. at 111)

On August 22, 2006, Plaintiff began having trouble with her hip replacement, complaining to Dr. Carson of a squeaking sound. (R. at 113) Dr. Carson feared that the acetabular liner of the prosthesis was loosening. (R. at 113) On September 18, 2006, Plaintiff reported to Dr. Carson that her hip had stopped squeaking two weeks prior, but that she had a sudden onset of pain. (R. at 114) She expressed concern that the hip was coming out. (R. at 114)

On September 27, 2006, Judy Spencer, a physician's assistant at Summersville Memorial Hospital Sleep Diagnostics, reported that Plaintiff was diagnosed with sleep apnea. (R. at 365)

On September 5, 2006, Dr. Julian Bales, WVU Department of Neurology, performed a cervical microdiskectomy and fusion of the C5-C6 discs on Plaintiff. (R. at 410-15) Her postoperative diagnosis was a C5-C6 disc herniation / osteophyte with cervical radiculopathy. (R. at 410) Plaintiff's discharge summary describes her as "very active as a farmer." (R. at 413) Followup examinations of Plaintiff in October, November, and December 2006 indicated that the fusion was stable and that Plaintiff's spine was anatomically aligned. (R. at 423-425)

Dr. Bailes reported on October 23, 2006, that Plaintiff had done well and had no further neck or arm pain. (R. at 431) Dr. Bailes further stated that he was "very pleased" with Plaintiff's progress, and that her motor, sensory, and reflex testing was within normal limits. (R. at 431)

On November 14, 2006, Plaintiff was evaluated by Rolando Garcia, a physician's assistant with University Health Associates in Morgantown, West Virginia. (R. at 429) Garcia reported that Plaintiff was doing "very well, as far as resolution of her symptoms including her left hand numbness. This seems to have resolved about 95%." (R. at 429) Garcia further reported that Plaintiff still had right hand numbness; however, the numbness continued to improve daily. (R. at 429) Plaintiff denied having any myelopathy, had no complaints of pain, and denied any weakness. (R. at 429) Plaintiff's spine was stable with good alignment, and her gait was steady. (R. at 429)

On January 8, 2007, Plaintiff was evaluated by Dr. Vincent Miele and Dr. Bailes, who reported that Plaintiff was doing fairly well and had a significant decrease in neck and left arm pain. (R. at 427) Due to continuing parasthesia and numbness, a repeat MRI was performed, which showed good placement of the spinal hardware and no herniation. (R. at 427) Dr. Miele and Dr.

Bailes determined that Plaintiff could return to full activities, and stated that she was counseled on proper lifting technique.  (R. at 427)  Dr. Bailes concluded by noting that his office would see her on an "as needed" basis if her symptoms recur.  (R. at 427)

On July 17, 2007, A. Rafael Gomez, M.D., a state agency physician, evaluated the medical evidence for a physical residual functional capacity assessment and reported that Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk for at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and had limited ability to push and pull with her lower extremities.  (R. at 444-51)  Dr. Gomez noted that Plaintiff's walking should be reduced to 2-4 hours in an 8-hour workday.  (R. at 445)  Plaintiff could occasionally climb ramps and stairs, stoop, and crouch.  (R. at 446)  Plaintiff could never climb ladders, ropes, or scaffolds, balance, kneel, or crawl.  (R. at 446)  Plaintiff should avoid concentrated exposure to vibration, and should avoid all exposure to hazards.  (R. at 448)  Dr. Garcia found that "[Plaintiff] is credible.  She has morbid obesity level III.  She had left total hip arthroplasty and bilateral knee arthroplasties.  Patient has other medical complications.  She is reduced to sedentary work."  (R. at 449)

On August 24, 2007, Vivian J. Carr, a physician's assistant with Central WV Community Health Center, reported that Plaintiff contracted poison ivy after carrying wood the night before.  (R. at 476-77)

On December 19, 2007, Marcel Lambrechts, M.D., a state agency physician, evaluated the medical evidence for a physical residual functional capacity assessment, reporting that Plaintff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/ord walk at least 2 hours

in an 8-hour workday, sit about 6 hours in an 8-hour workday, and had unlimited ability to push and pull in her lower extremities. (R. at 479-86) Dr. Lambrechts determined that Plaintiff has some problems with bathing, walking, climbing, and lifting, and can stand for a maximum of 2-3 hours per day. (R. at 480) Plaintiff could occasionally climb ramps or stairs, stoop, or kneel. (R. at 481) Plaintiff could never climb ladders, ropes, or scaffolds, balance, crouch, or crawl. (R. at 481) Plaintiff should avoid concentrated exposure to extreme heat or cold, avoid moderate exposure to vibration, and avoid all exposure to hazards. (R. at 483) Dr. Lambrechts noted that Plaintiff had a new left hip and new knees, and that her ability to get around is limited but that she can do so slowly. (R. at 484) Lifting climbing, and prolonged walking are all severely reduced. (R. at 484) Most of these problems are the result of Plaintiff's morbid obesity and type 2 diabetes, for which she is supposed to be on medication. (R. at 484)

On February 29, 2008, Dr. Trenbath filled out Medicaid forms so that Plaintiff could get tests done to check for abdominal cancer. (R. at 524) Dr. Trenbath reported that Plaintiff could get on and off the examining table without difficulty but cannot hold her feet together and touch her toes. (R. at 524) Plaintiff had to keep her left leg straight to avoid dislocating her hip. (R. at 524)

On January 8, 2009, Plaintiff suffered a total left hip dislocation after violently falling on some wet linoleum in her home. (R. at 120) A closed reduction was performed; post-reduction films showed that the hip had reduced and that Plaintiff was relieved of her symptoms. (R. at 120) Plaintiff was cleared to return home that evening, with instructions to use an abduction pillow in bed and walk for awhile with a walker. (R. at 120)

On January 21, 2009, Dr. Trenbath filled out a Primary Care Physician Questionnaire for Plaintiff's disability claim. (R. at 129, 526-34) On the questionnaire, Dr. Trenbath agreed with Plaintiff's claims of having arthritis, neck problems, a left hip replacement, right and left knee replacements, flat feet, severe varicose veins, hypertension, diabetes, allergies, sleep apnea, obesity, abdominal problems, numbness in the hands, back pain, fatigue, and headaches. (R. at 527) Dr. Trenbath indicated that Plaintiff could not perform sedentary work for 8 hours a day, and could only perform part-time sedentary work on a 1-2 hour per day basis because she "gets very sore all over if she does not get up and move." (R. at 528) Dr. Trenbath recommended a sit/stand option, at Plaintiff's discretion, to vary her body position. (R. at 528) In an 8 hour day, Plaintiff could only sit for 1 hour, stand for 20 minutes, walk for 10 minutes, and during that time it would be necessary for her to have frequent rest periods as needed, and would need to recline or lie down with her feet up. (R. at 529) Dr. Trenbath found that Plaintiff would experience chronic, severe pain in her feet due to her impairments, and would experience intermittent severe pain. (R. at 530-31) Plaintiff would require the use of a walking stick for 50% of her mobility. (R. at 531) Dr. Trenbath indicated that obesity would play a role in Plaintiff's need for an assistive device, but did not explain this conclusion as requested on the form. (R. at 531) Plaintiff cannot use her feet or legs for repetitive movements because it hurts a lot. (R. at 532) She cannot use her hands for fine manipulation / fingering, and cannot sit upright at a desk for prolonged periods of time because of numbness in the hands. (R. at 532) Dr. Trenbath opined that Plaintiff would likely be absent more than twice a month from a regular job due to her medical impairments, and ultimately concluded that she could

not perform any full-time job on a sustained basis. (R. at 533) The stated reason that Plaintiff could not work was that she had multiple joint replacements. (R. at 533)

Dr. Carson performed a follow-up examination of Plaintiff's hip on January 22, 2009. (R. at 121) Dr. Carson noted that she was not having any trouble with pain, and that she was ambulating well. (R. at 121)

On March 12, 2009, Plaintiff visited Dr. Carson for an examination of her hip, which had dislocated twice in recent months. (R. at 122) Dr. Carson stated that the x-rays showed questionable loosening of the ceramic liner, but that overall there was not much difference from previous films. (R. at 122)

On March 24, 2009, Plaintiff visited Dr. Carson for a pre-surgery consultation. (R. at 123) Dr. Carson's report states that Plaintiff dislocated her hip on several recent occasions, and that one such dislocation occurred while putting her leg up on a church pew. (R. at 123) Plaintiff was prescribed an abduction orthosis, which worked well for some time. (R. at 123) Plaintiff could walk with the orthosis; however, she walked with a diminished stance on the dislocation side. (R. at 123) However, due to the unstable nature of the prosthesis, Dr. Carson recommended surgery to revise the hip replacement to fix the loosened acetabular lining. (R. at 123-24)

On March 25, 2009, Plaintiff underwent surgery to correct the loosened acetabular lining of her prosthesis. (R. at 125) The lining itself was properly fitted, but a metal interface within the lining had loosened and was removed. (R. at 125) The prosthesis was repaired, and Dr. Carson noted that Plaintiff tolerated the surgery well. (R. at 126) The discharge summary from the surgery

notes that Plaintiff's hip dislocated again in the recovery room following surgery, but it is unclear how this dislocation occurred.  (R. at 127)  However, at the time of her discharge on March 30, 2009, Plaintiff could ambulate well with a 4-point walker and abduction orthosis, and was full weight-bearing.  (R. at 127)

Plaintiff visited Dr. Carson on April 7, 2009, to have the staples from her surgery removed. (R. at 128)  Plaintiff reported to Dr. Carson that she felt her hip was more stable.  (R. at 128)

D.      Psychological Evidence

On January 16, 2009, Plaintiff, at the request of her attorney, was evaluated by psychologist Sharon J. Joseph, Ph.D.  (R. at 539-44)  Plaintiff reported that she had never been treated for emotional or psychological problems, but felt that she was currently depressed due to her physical problems and the fact that she is unable to do things she had previously been able to do.  (R. at 540) Plaintiff reported sleep difficulties due to overactive bladder and sleep apnea.  (R. at 541)  Dr. Joseph determined that her mood appeared depressed, but that Plaintiff denied suicidal and homicidal ideation.  (R. at 541)  Plaintiff's judgment, concentration, and memory were deemed to be within normal limits; her intelligence was above average on two different standardized intelligence assessments; and overall Dr. Joseph opined that she had a valid measure of Plaintiff's current intellectual functioning.  (R. at 541-43)  After administering a screening test for depression and a multiphasic personality assessment, Dr. Joseph concluded that Plaintiff suffered from a single, mild episode of depression, a pain disorder with both physical and psychological components, and determined that Plaintiff's Global Assessment of Functioning (GAF) scale was 60.  (R. at 544)

On January 26, 2009, Dr. Joseph completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities form for Plaintiff.  (R. at 545-50)  Due to her depressive symptoms and pain disorder, Dr. Joseph determined that Plaintiff had moderate impairment in her ability to sustain her attention, concentrate and complete a normal workday without interruptions from psychological symptoms, travel independently in unfamiliar places, and tolerate ordinary work stress.  (R. at 545-46, 548-49)  Dr. Joseph also determined that Plaintiff had mild impairment in her ability to perform a number of other work-related functions, all of which were attributable to her depressive symptoms and pain disorder.  (R. at 545-549)  Dr. Joseph concluded that Plaintiff's symptoms had been at a constant severity since January 1, 2005, the alleged date of disability.  (R. at 549)  Dr. Joseph also filled out a Psychiatric Review Technique form.  (R. at 551-64)  Dr. Joseph determined that Plaintiff's functional limitation did not satisfy the "B" or "C" criterion for the listings under which she was evaluated.[2]  (R. at 562)

E.      Testimonial Evidence

At the ALJ hearing held on February 4, 2009, Plaintiff testified that the only work she has performed since 1984 are duties as councilwoman and mayor of the town of Camden-on-Gauley, West Virginia, and election work for Webster County, West Virginia.  (R. at 53-55)  As part of her mayoral duties, Plaintiff also attends city council meetings, and city water and sewer board meetings.  (R. at 60-61)

---

[2]Plaintiff was evaluated under listings 12.04 and 12.07.  (R. at 561)  Listing 12.04 consists of Affective Disorders, such as depression, and listing 12.07 consists of Somatoform Disorders.  See 20 C.F.R. Pt.  404, Subpart P, Appendix 1, §§ 12.02, 12.04.

Plaintiff testified that she is 5'5" tall and weighs roughly 290 pounds. (R. at 50) She considers herself to be extremely overweight, and used to have issues with diabetes; however, she testified that her diabetes is under control due to careful monitoring of her diet. (R. at 59) She testified that, about a month after her hip replacement surgery, she fell and dislocated her hip, and has since had trouble with the joint dislocating. (R. at 58) She also has bad varicose veins in her legs, which cause her legs to swell if she stands for long periods of time. (R. at 58) Plaintiff testified that she suffers from headaches and numbness in her hands, and that these conditions are aggravated by lifting her hands and sitting in certain positions. (R. at 60) Plaintiff's headaches are mainly a problem at night, and she attributes the headaches to her neck and back problems. (R. at 73) Plaintiff also testified that her headaches get worse if she has to sit and type at a computer. (R. at 74)

On a good day, Plaintiff can walk several hundred feet. (R. at 61-62) She does not walk outside without a walking stick. (R. at 71) She can only stand in one place for a few minutes, cannot bend her knees and squat, and can only bend over at the waist if she positions her left leg to keep her hip from dislocating. (R. at 62) She can lift 10 pounds on a regular basis, and testified that she can sit for only 30 minutes comfortably before needing to stand up for a minute. (R. at 63) She testified that she cannot drive long distances due to her sleep apnea, which leaves her too tired to drive more than 30 minutes without needing a nap. (R. at 51)

Plaintiff acknowledged being evaluated by Dr. Joseph, but denied having any depression and stated that her faith in God would not allow her to become depressed. (R. at 63) She has not been

hospitalized for mental problems, and has not had any therapy or counseling. (R. at 63)

Plaintiff concluded her testimony by stating that the lack of current medical evidence stems from her lack of insurance. (R. at 75) She believes that she may have other, more recent injuries related to her deteriorating joints and back, but cannot afford to seek medical treatment. (R. at 75) Prior to her divorce she was covered by medical insurance, which paid for the many surgeries she underwent; however, since her divorce, she has had to apply for medical card coverage for any medical procedures she needs. (R. at 56)

Eugene Chuman, a vocational expert, also testified at the hearing on February 4, 2009. (R. at 75) Chuman testified that plaintiff has no substantial gainful work activity, stating that the work she does perform as a mayor is on a part time, "very micro instead of macro process." (R. at 76) In regard to Plaintiff's ability to perform work in the regional economy, Chuman offered the following responses to the ALJ's questions:

> Q.     The regulations say that an individual as such is a younger individual. She has a high school education. She – two years of college but no degree. And no past work at substantial gainful work activity levels. I want you to assume the sedentary exertional level of work. Lift ten pounds occasionally, less than ten pounds on a frequent basis. Standing and walking is only possible two hours out of an eight hour day. Sitting could be accomplished six hours out of an eight hour day with normal breaks. On the postural activities, no climbing of any ladders, ropes, or scaffolding, balance, crouching, or crawling. Only occasionally climb ramps and stairs, stoop, or kneel.

> A.     Okay.

> Q.     Avoid concentrated exposure to temperate extremes, by that I mean heat and cold. Avoid even moderate exposure to full body vibration and avoid hazards. By hazards I mean working around moving plant machinery or any

unprotected heights.  At the sedentary exertional level would there be any jobs that you can identify in the national or regional economy that would accommodate such a hypothetical and, of course you would have to define the region that you're testifying about?

A.      Region would be the state of West Virginia.  The following fit within the hypothetical as given.  Type copy examiner, 70,000 national, 300 regional.  Addressing clerk, 70,000 national, 500 regional.  Charge account clerk, 85,000 national, 200 regional.  That's a sampling and these are all sedentary, unskilled.

Q.      Unskilled?

A.      Yes, sir.

Q.      All right.  Assume that the testimony of Ms. Cowger is considered credible and good, the medical evidence supports no ability to maintain a sufficient level of concentration, persistence, and pace to accomplish an eight hour workday, five days a week for forty hours.  Consider that the level of pain and discomfort from her artificial joints and other issues related to her condition would cause her to have marked inability to maintain a sufficient level of attention, concentration, or pace, and be off task at least a third of an eight hour workday.

A.      Um-hum.

Q.      Consider also that there would be absences from work.  The absences would exceed those which are vocationally acceptable rising to the level of two or more in a thirty day period, perhaps closer to four.  Well, in that event, Mr. Chuman, would there be jobs you could identify for her?

A.      No, sir.

Q.      And I believe you indicated that the jobs that you identified were unskilled type work activity?

A.      That's correct, sir.

(R. at 77-78)

F.    Lifestyle Evidence

Plaintiff lives with her elderly mother on a farm near Camden-on-Gauley, West Virginia. (R. at 51-52, 65-66)   Plaintiff's daily routine is summarized in Dr. Joseph's psychological evaluation:

> The patient reports that she gets up between 6:00 and 8:00 A.M.  She watches the morning news, eats breakfast, looks in on the animals, and drives to the post office. In the afternoon, she eats lunch, feeds and waters the animals, and gathers eggs.  In the evening, she eats dinner and goes to meetings or to church.  She states she is able to make the bed if it is not too low, run the vacuum, wash dishes, dust, and cook quick meals.  She is unable to clean the bathroom, mop the floor, or shovel the sidewalk in winter.  She can put groceries away gradually, and states that she has a great deal of difficulty going up and down stairs.  She is able to mow the yard with a riding mower and go grocery shopping if she can use a scooter.  She states she is able to drive a car and manager her finances.

(R. at 544)

At the ALJ hearing on February 4, 2009, Plaintiff testified that she watches 2-3 hours of TV each day, and reads for an additional hour.  (R. at 67)  She feeds and waters the livestock on her farm, which in the winter involves carrying milk jugs of water down to her chicken coop.  (R. at 67) She sometimes walks, and sometimes drives her truck, to the chicken coops, which are 500 feet from the house.  (R. at 73)  She also uses a riding mower to mow her lawn, which typically takes her 90 minutes.  (R. at 68)  She stated that she can dust, water her houseplants, load and unload the dishwasher, and load and unload the washer and drier.  (R. at 68)  She does not like to climb the stairs in her home, and instead chooses to sleep on the couch; twice a month, she goes upstairs and retrieves 5-6 different outfits so she can change clothes.  (R. at 68)  She does her own shopping, but she testified that there are some days that she will not go into Wal-Mart without getting a shopping

cart, or preferably an electric power chair. (R. at 61-62)  Plaintiff attends church three times a week, and she testified that she sits through some services that are 90 minutes in length.  (R. at 70)  Plaintiff attends three meetings a month in her capacity as mayor, head of the sewer board, and member of the water board.  (R. at 53)  She is a matron of the Eastern Star, but has not attended meetings in several years.  (R. at 70)  A few nights a month, she babysits her three-year-old grandson.  (R. at 69-70)

### III.  CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, alleges that the decision of the ALJ is not supported by substantial evidence.  (See Pl.'s Br. in Supp. of Mot. for Summ. J. 5, ECF No. 15)  Specifically, Plaintiff argues that the ALJ:

1.　improperly concluded that Plaintiff did not meet or equal Listing 1.03 for disability due to reconstructive surgery of a major weight-bearing joint because his conclusion did not consider each of Plaintiff's impairments individually and ignores evidence in the record demonstrating that she cannot ambulate effectively (Pl.'s Br. 5-8);

2.　did not provide an explanation for why Plaintiff's neck and back impairments do not satisfy the criteria for Listing 1.04 for disability due to disorders of the spine (Pl.'s Br. 8-9);

3.　did not properly follow SSR 02-01p when evaluating Plaintiff's obesity, and failed to consider her obesity at Step 3 of the evaluation process (Pl.'s Br. 10-11);

4.　did not apply the second step of the two-step subjective pain analysis set forth in SSR 96-7p because his conclusion is based solely on Plaintiff's lack of treatment and lack of prescription medication (Pl.'s Br. 11-13);

5.　did not apply SSR 96-5p in rejecting Dr. Trenbath's conclusion that Plaintiff could not engage in full time sedentary work (Pl.'s Br. 11-13); and

6.      improperly determined that Plaintiff had the residual functioning capacity ("RFC") to perform sedentary work because his conclusion did not take into account Plaintiff's hip dislocations and revision surgery, and relied upon an incomplete hypothetical posted to the Vocational Expert. (Pl.'s Br. 13-14)

In response, Defendant argues in his motion for summary judgment that the ALJ's final decision denying Plaintiff's claim for SSI benefits is supported by substantial evidence. Specifically, Defendant argues that:

1.      Plaintiff failed to establish that she meets Listing 1.03 because evidence in the record indicates that she is able to ambulate effectively (Def.'s Br. 13-15);

2.      the ALJ considered Plaintiff's neck, back, and obesity problems in formulating her RFC (Def.'s Br. 16-17);

3.      the evidence in the record contradicts Plaintiff's subjective complaints of disabling pain, and the ALJ properly weighed this evidence when he concluded that Plaintiff's testimony was not credible (Def.'s Br. 17-18);

4.      the ALJ properly rejected Dr. Trenbath's evaluation of Plaintiff's ability to work because his report provides no support for his conclusions and the ALJ is not required to consider or accept Dr. Trenbath's statement that Plaintiff is disabled (Def.'s Br. 18-19);

5.      the ALJ's RFC assessment is supported by evidence in the record indicating that Plaintiff could conduct her daily activities and posed a hypothetical to the Vocational Expert that took into account the characteristics of Plaintiff as developed in the record. (Def.'s Br. 20-21)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

Judicial review of a final decision regarding disability benefits . . . is limited to

determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A. Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in

which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

B.    The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.    **The claimant has not engaged in substantial gainful activitiy since April 20, 2007, the application date.** (R. at 31)

2.    **Since April 20, 2007, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: C5-6 diskectomy and fusion; bilateral total knee replacements; left hip replacement; obesity; major depressive disorder; flat feet; varicose veins; hypertension; diabetes; allergies; sleep apnea; and abdominal problems.** (R. at 31)

3.    **Since April 20, 2007, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any of the listed impairments in Appendix 1, Subpart P, Regulation #4.** (R. at 32)

4.    **After careful consideration of the entire record, the undersigned finds that at all times since April 20, 2007, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) that: requires no climbing of ladders, ropes, or scaffolds, and no balancing, crouching, or crawling; no more than occasional climbing of stairs, stooping, and kneeling; no exposure to temperature extremes, and no more than moderate exposure to full body vibration, and hazards such as moving plant machinery.** (R. at 33)

5.    **The claimant has no past relevant work.** (R. at 36)

6.    **The claimant was born on June 15, 1960 and was 46 years old, which is defined as a younger individual age 45-49, on the date the application was filed.** (R. at 36)

7. **The claimant has a limited education and is able to communicate in English.** (R. at 36)

8. **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.** (R. at 36)

9. **The claimant has not been under a disability, as defined in the Social Security Act, since April 20, 2007, the date the application was filed.** (R. at 37)

C.    <u>Substantial Evidence Supports the ALJ's Conclusion That Plaintiff Does Not Meet the Requirements of Listing 1.03 Because She Can Walk Without Use of an Assistive Device That Limits the Function of Both Upper Extremities</u>

Plaintiff contends that her medical condition meets or exceeds the requirements of Listing 1.03, reconstructive surgery or surgical arthrodesis of a major weight-bearing joint. (Pl.'s Br. 5-8) Plaintiff further argues that the ALJ should have considered each of Plaintiff's impairments individually; that the ALJ ignored medical evidence in the record that demonstrates Plaintiff's inability to effectively ambulate; and that the ALJ ignored, on the basis of credibility, Plaintiff's testimony about her physical limitations. (Pl.'s Br. 6-8) Defendant counters these arguments by pointing out that evidence in the record shows that Plaintiff had full mobility in both legs, that she used only occasional over-the-counter medications for pain, and that she could walk for up to an hour without any increased discomfort. (Def.'s Br. 15) Defendant asserts that this evidence is inconsistent with a finding of disability under one of the listed impairments because the listings are intended to be applied more stringently than the standard of disability. (Def.'s Br. 12)

Section 1.03 of the Listing of Impairments requires (1) reconstructive surgery or surgical

arthodesis of a major weight-bearing joint, (2) with inability to ambulate effectively, as defined in 1.00B2b, and (3) return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03. Section 1.00B2b defines the "inability to ambulate effectively" as an impairment that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1). "Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning **of both upper extremities.**" Id. (emphasis added).[3]

In this case, the ALJ not only provided evidence in support of his conclusion, he applied that evidence directly to the requirements listed under § 1.03. After noting that Listing 1.03, at the outset, requires surgical arthrodesis of a major weight bearing joint, the ALJ stated that "claimant's bilateral knee and left hip replacements certainly satisfy the first requirement of this Listing." (R. at 32) However, the ALJ determined that Plaintiff did not meet the second requirement:

> The claimant testified that she can walk several hundred feet on a good day, usually with a walking stick, and that she walks the 500 feet from her home to the chicken house on her farm, sometimes being able to return to her home without sitting down. In her Function Report, the claimant indicated only that her legs would hurt with prolonged walking. (Exhibit 6E). The claimant's treating physician indicated that she depends on her walking stick about 50% in order to function during the day. (Exhibit 21F). The claimant's ability to walk is clearly not so limited as to satisfy

---

[3]Plaintiff's brief emphasizes the examples given under § 1.00B2b(2). (Pl.'s Br. 5-8) However, as stated in the regulations, the determination of Plaintiff's ability to ambulate is made "without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2a.

the "inability to effectively ambulate" requirement of Listing 1.03.

(R. at 33)  The fact that Plaintiff's treating physician acknowledged that she can walk 50% of the time without the use of any assistive device, and 50% of the time with only a single walking stick, is, standing alone, substantial evidence supporting the ALJ's conclusion.  See Holfield v. Astrue, 2010 WL 2612604 at *3 (W.D.Va. June 25, 2010) (substantial evidence supported ALJ conclusion that Plaintiff did not meet the requirement of § 1.00B2b(1) because Plaintiff's treating physician stated that Plaintiff did not have to use an assistive device when standing or walking).  However, the ALJ went even further, noting Plaintiff's own testimony that she can walk 500 feet across her farm with the assistance of only one walking stick.  (R. at 33, 73)  Because it is clear that Plaintiff can ambulate without using a two-handed assistive device, and can walk several hundred feet across farmland with only a walking stick, the undersigned Magistrate Judge finds that substantial evidence supports the ALJ's conclusion that Plaintiff's medical condition does not meet or equal Listing 1.03.

D.  The ALJ's Failure to Specifically Discuss Listing 1.04 Was Harmless Because Plaintiff Concedes That Her Condition Does Not Meet the Requirements of the Listing

Plaintiff next contends that the ALJ erred in failing to assess her neck and spinal impairments at Step Three of the evaluation process; specifically, Plaintiff contends that the ALJ should have discussed Listing 1.04 and explained why the evidence of record did not meet or equal that listing.  (Pl.'s Br. 8-9)  Defendant does not directly respond to this point, arguing instead that the ALJ assessed Plaintiff's neck and spinal problems in formulating Plaintiff's RFC.  (Def.'s Br. 16-17)

"Administrative determinations are required to be made in accordance with certain procedures which facilitate judicial review."  Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986)

In order for the reviewing court to determine if the Secretary based his decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment. Id. "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." Id.

Plaintiff claimed neck problems and was diagnosed with degenerative disc disease in her cervical spine, so the ALJ should have included in his Step Three analysis a discussion of Listing 1.04. (R. at 33, 410-15) However, "[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); Hurtado v. Astrue, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("The court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision"); cf. Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached."). In her brief, Plaintiff states that "**[a]lthough the evidence does not meet 1.04**, the impairment should have been considered and explanation provided as to why the Listing was not met or equaled . . . ." (Pl.'s Br. 9) (emphasis added) Considering that Plaintiff herself concedes that

the evidence fails to meet the listing, it is immaterial to the outcome of the decision that the ALJ did not specifically address Listing 1.04.[4]  Therefore, the undersigned Magistrate Judge finds that the ALJ's failure to discuss Listing 1.04 is harmless error that does not require reversal and remand.

E.    The ALJ Did Not Need to Specifically Address Plaintiff's Obesity at Step Three Because Substantial Evidence Supports the ALJ's Conclusion that Plaintiff Can Ambulate Effectively

Plaintiff argues that the ALJ did not discuss her obesity at Step Three of the evaluation process, ignoring the guidance set forth by the Social Security Administration in SSR 02-1p.  (Pl.'s Br. 19-20)  Defendant does not directly address this contention, arguing instead that the ALJ considered Plaintiff's obesity in formulating the RFC prior to Step Four.  (Def.'s Br. 16-17)

Obesity, while no longer a listed impairment, is a medically determinable impairment that can meet or equal a listing impairment when combined with an impairment of the musculoskeletal, respiratory, or cardiovascular body system.  SSR 02-1p, 2000 WL 628049 at *1 (Sept. 12, 2002).  At Step Three of the evaluation process, the administrator may find that obesity, either by itself or in combination with other impairments, meets a listed impairment if the obesity is equivalent in severity: "[f]or example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for [the criteria of 1.02A] and we will then make a finding of medical equivalence."  Id. at *5.

A key requirement of many of the 1.00 series of Musculoskeletal impairments is the

---

[4]Additionally, the Court notes that Plaintiff did not identify for the ALJ the listings that she believed to apply to her case.  (R. at 33)  The ALJ's decision states that Plaintiff specifically argued that her orthopedic conditions prevented her from ambulating effectively, and thus the ALJ's discussion focused primarily on Plaintiff's potential disability under Listing 1.03 due to her three joint replacements.  (R. at 32-33)

"inability to ambulate effectively."[5]  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2a ("Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively . . .."); see also 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.01-1.08 (specific listings).  The ALJ specifically addressed Plaintiff's ability to ambulate effectively in his discussion of Listing 1.03, finding that "[t]he claimant's ability to walk is clearly not so limited as to satisfy the 'inability to effectively ambulate' requirement of Listing 1.03."  (R. at 33)  As discussed above, this conclusion is supported by substantial evidence because Plaintiff does not use an assistive device that limits the functioning of both upper extremities. Plaintiff's obesity, therefore, does not "increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing."  SSR 02-1p, 2000 WL 628049, at *5.  Because a discussion of Plaintiff's obesity would not change the ALJ's conclusion, his failure to explicitly state that Plaintiff's obesity, in combination with her other impairments, did not meet a listed impairment was harmless error.  See Prochaska v. Barnhart, 454 F.3d 731, 736-37 (7th Cir. 2006) ("[A] failure to explicitly consider the effects of obesity may be harmless error."); see also Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) ("[A]ny remand for explicit consideration of [claimant's] obesity would not affect the outcome of this case."); cf. Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004).  Therefore, the undersigned Magistrate

_____

[5]The Court notes that sections 1.04, 1.05, 1.07, and 1.08 do not specifically require that Plaintiff have an inability to ambulate effectively as defined in 1.00B2b.  Of these sections, only § 1.04 is potentially at issue in this case; however, Plaintiff concedes in her brief that the evidence of record does not meet the listing.  (Pl.'s Br. 9)  The Court further notes that Plaintiff's counsel specifically argued that she met the listings because she "has an inability to ambulate effectively."  (R. at 32)

Judge finds that any error committed by the ALJ in failing to explicitly discuss Plaintiff's obesity at Step Three is harmless and does not warrant reversal and remand.

F.   The ALJ Properly Applied SSR 96-7p In Making His Credibility Determination And That Determination Is Supported By Substantial Evidence

Plaintiff's next argument is that the ALJ's credibility determination lacks substantial evidence because he did not properly apply step two of SSR 96-7p. (Pl.'s Br. 11-12) Specifically, Plaintiff argues that the ALJ's primary reasons for disregarding her allegations of pain are a lack of medical treatment, lack of prescriptions, and an inconsistency between her daily activities and allegations of pain. (Pl.'s Br. 11) In response, Defendant argues that Plaintiff's daily activities and medical history support the ALJ's conclusion that Plaintiff's subjective complaints of pain are inconsistent with her RFC assessment. (Def.'s Br. 17-18)

The determination of whether a person is disabled by pain or other symptoms is a two step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Id. (quoting 20 C.F.R. §§ 416.929(b), 404.1529(b)). Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. See id. at 595. Social Security Ruling 96-7p sets out detailed guidelines for assessing the credibility of an individual's subjective allegations of pain, listing the following factors to be considered in making a credibility determination:

1.      The individual's daily activities;

2.      The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.      Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. <u>Shively v. Heckler</u>, 739 F.2d 987, 989-90 (4th Cir. 1984). However, the ALJ's determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374,186, at *2.

Neither Plaintiff nor Defendant dispute the ALJ's conclusion that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . .." (R. at 34) In support of this conclusion, the ALJ references Plaintiff's three joint replacements, spinal surgery, obesity, and the psychological evaluation performed by Dr. Joseph. (R. at 34-35) Because the objective medical evidence in the record indicates that Plaintiff does in fact suffer from

these conditions, it was proper for the ALJ to assess the credibility of Plaintiff's testimony about her symptoms. See Craig, 76 F.3d 585. In making his credibility determination, the ALJ's opinion included evidence pertaining to all seven factors listed in SSR 96-7p. First, the ALJ discussed evidence of Plaintiff's daily activities:

> Not only is the claimant the mayor of a small town and a board member of its Water and Sewer Board, but the claimant and her elderly mother own and operate a farm and care for livestock on a daily basis. (Exhibit 6F). Although the claimant testified that she has help with the more labor intensive chores that have to be done around the farm, she is able to do many of the daily chores. The claimant also performs household chores, goes shopping, attends scheduled meetings, and attends church.

(R. at 35)

Second, the ALJ discussed the location, duration, frequency, and intensity of the Plaintiff's symptoms, noting that "she still has swelling in her legs if she is up on them for too long . . . she still has pain in her neck even after her surgery . . . she has headaches, usually at night . . . [and] she has difficulty holding her hands out to hold a newspaper or drive." (R. at 34)

Third, the ALJ mentioned factors that precipitate or aggravate the above symptoms, such as standing on her feet for too long (leg swelling), lifting, typing, and sitting (neck pain), and lifting more than she should (headaches). (R. at 34)

Fourth, the ALJ noted that Plaintiff does not take any medication "other than occasional over the counter Aleve" to alleviate her symptoms. (R. at 34)

Fifth, the ALJ noted that, other than a visit in January 2009 to correct a hip dislocation caused by a "violent fall," Plaintiff had not sought treatment for pain or other symptoms since completing her surgeries. (R. at 34) In support, the ALJ's stated that Plaintiff had not seen an

orthopedic specialist since late 2006 or a neurosurgeon since early 2007, that her diagnoses at these final visits were good, and that she had been released to full activity by her neurosurgeon with no restrictions imposed by the orthopedic specialists.  (R. at 34)  Although Plaintiff testified that she has not sought treatment for her symptoms due to the fact that she does not have medical insurance, the ALJ noted that Plaintiff sought and received Medicaid coverage in February 2008 to check for abdominal cancer, and again in January 2009 to treat her dislocated hip.[6]

Sixth, the ALJ noted that Plaintiff "puts her feet up every couple of hours at hip level for 20-30 minutes each time" to help with her leg swelling.  (R. at 34)

Finally, the ALJ took into account other factors concerning Plaintiff's functional limitations. The ALJ addressed Plaintiff's obesity, finding that "[t]he claimant reports that she is 5'5" and weighs 290 pounds, a body habitus that may be reasonably anticipated to produce or contribute to symptoms of back, knee or other musculoskeletal pain, and to generally limit mobility and stamina."  (R. at 35) The ALJ also addressed Plaintiff's psychological condition, finding that most of Dr. Joseph's opinion "is in agreement with the undersigned's finding that the claimant's depression imposes no more than mild limitations."  (R. at 35)  Although the ALJ did not accept those portions of Dr.

---

[6] Plaintiff's brief counters the ALJ's conclusions as to her ability to seek treatment by relying on Gordon v. Schweiker, in which the court of appeals stated that "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.  Social Security Ruling 82-59 does say that inability to pay for treatment is a good reason for a refusal to follow prescribed treatment." Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984).  However, the Court notes that Gordon is factually distinguishable from the case at bar because Plaintiff has not refused treatment for an identified medical condition.  See Gordon, 725 F.2d at 237 (remanding for further proceedings to allow claimant to show just cause for not undergoing surgery on his cataracts).

Joseph's opinion that were attributed to Plaintiff's complaints of chronic pain, he did state that "many of the limitations noted by Dr. Joseph have been accommodated in the residual functional capacity assessment."  (R. at 35)

As noted above, the ALJ considered evidence pertaining to all seven factors listed in SSR 96-7p.  Therefore, the undersigned Magistrate Judge finds that the ALJ properly applied the second step of the analysis required under SSR 96-7p.

After considering the factors contained in SSR 96-7p, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 34)  In reaching this conclusion, the ALJ determined that Plaintiff's daily activities are inconsistent with her complaints of disabling pain, noting that she performs daily chores on her farm, daily household chores, goes shopping, attends scheduled meetings, and attends church.  (R. at 35) Furthermore, the fact that Plaintiff uses only occasional over-the-counter pain relievers "detract[s] from the overall credibility of the claimant's statements regarding the intensity of her symptoms." (R. at 35)  The ALJ also determined that Plaintiff's complaints were inconsistent with her medical history; by April 2007, Plaintiff "had been released to full activity by her neurosurgeon and there were no restrictions of record from her orthopedic specialists."  (R. at 34)  Finally, the ALJ accepted the reports of the State Agency physicians, finding them to be consistent with the record as a whole. (R. at 36)  The only evidence that was consistent with Plaintiff's allegations were reports from Dr. Trenbath and portions of Dr. Joseph's report, which the ALJ afforded little weight because they

contradicted the medical history and the Plaintiff's own testimony. (R. at 36). Because the ALJ's credibility conclusion is supported by Plaintiff's testimony about her daily activities and medication usage, the State Agency opinions, and the treatment records of her neurosurgeon and orthopedic specialists, the undersigned Magistrate Judge finds that this determination is supported by substantial evidence.

G.    The ALJ Properly Weighed the Opinions of Dr. Trenbath as Required by SSR 96-5p

Plaintiff's next assignment of error is that the ALJ did not follow SSR 96-5p when he considered the opinions of Dr. Trenbath. (Pl.'s Br. 11-12) Plaintiff's argument is not entirely clear on this point, but appears to assert that the ALJ, in making his RFC determination, should have assigned controlling weight to Dr. Trenbath's opinion that Plaintiff could not engage in full time sedentary work. (Pl.'s Br. 12) Defendant, in turn, argues that Dr. Trenbath's opinion is not accompanied by a written explanation and that his opinion is inconsistent with his treatment notes, the treatment notes of the specialists that treated Plaintiff, and the Plaintiff's daily activities. (Def.'s Br. 19) Additionally, Defendant notes that the determination of the ultimate issue is reserved to the Commissioner and not Plaintiff's physician. (Def.'s Br. 19)

SSR 96-5p provides a policy interpretation for "medical source opinions on issues reserved to the Commissioner," including residual functional capacity assessments. SSR 96-5p, 1996 WL 374183 (July 2, 1996). According to SSR 96-5p, the regulations assign special significance to the opinions of treating sources, and in some instances these opinions are entitled to controlling weight. Id. at *2. However, treating source opinions on issues reserved for the Commissioner, such as the

RFC assessment, "are never entitled to controlling weight or special significance." Id. The adjudicator must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 and 416.927, and must adopt in his RFC any treating source medical opinion that is assigned controlling weight under the rules. Id. at *5. In weighing medical source statements under the regulations, "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) . . . is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Initially, it is important to note that Dr. Trenbath's opinion that Plaintiff cannot perform sedentary work is a legal conclusion reserved for the Commissioner and not a medical opinion. See Morgan v. Barnhart, 142 Fed.App'x 716, 722 (4th Cir. 2005) (not selected for publication) (finding that physician's statement that claimant "can't work a total of an 8 hour day" is a legal conclusion with no evidentiary value); see also 20 C.F.R. § 404.1527(e). Because this portion of Dr. Trenbath's opinion is not medical evidence, the undersigned Magistrate Judge finds that the ALJ was not required to assign it controlling weight in formulating Plaintiff's RFC.

Although Dr. Trenbath's opinion on the ultimate issue is not controlling, the fact remains that the ALJ was required to evaluate the medical opinions contained in the remainder of Dr. Trenbath's report. In this case, the ALJ determined that Dr. Trenbath's opinions should not be given controlling weight because "they are based solely on the claimant's subjective complaints, are inconsistent with the record as a whole and are inconsistent with the claimant's activities." (R. at 36) In support, the ALJ noted that, at the time he completed the primary care physician questionnaire, it had been nearly

a year since Dr. Trenbath had last examined the Plaintiff, so his opinions "are necessarily based on the claimant's subjective complaints because the doctor could not have had anything more than that before him at the time of his assessment." (R. at 36)  Because the ALJ did not find Plaintiff credible as to her subjective complaints of pain, he also declined to assign controlling weight to any opinion evidence based on those complaints.  (R. at 36)  The ALJ also determined that Dr. Trenbath's assessment was inconsistent with the Plaintiff's own testimony as to her daily activities; for example, Dr. Trenbath asserted that Plaintiff could only stand or walk for one hour, whereas Plaintiff herself testified that she is on her feet for two to three hours each day.  (R. at 36)  Furthermore, the ALJ's discussion points out the disparity between Dr. Trenbath's observations and those of Dr. Bailes and Dr. Miele, Plaintiff's neurosurgeons, who had cleared her for full activity in January 2007.  (R. at 34)  Accordingly, the undersigned Magistrate Judge finds that substantial evidence supported the ALJ's decision to assign less weight to Dr. Trenbath's medical opinions.

H.  <u>Substantial Evidence Supports an RFC Finding That Plaintiff Can Perform Sedentary Work Because the ALJ's RFC Determination is Consistent With the Evidence and the Opinions of the State Agency Physicians</u>

As her final assignment of error, Plaintiff argues that the evidence of record does not support an RFC finding that Plaintiff can perform sedentary work and that the hypothetical posed by the ALJ to the vocational expert is flawed because it assumed an RFC of sedentary.  (Pl.'s Br. 13-14) Plaintiff bases her argument on the fact that the State Agency physician assessments predate the opinion issued by Dr. Trenbath, who found that Plaintiff could not perform any work on a sustained basis.  (R. at 14)  Defendant contends that Plaintiff's limitations are properly considered in the RFC.

(Def.'s Br. 20-21)

A Residual Functional Capacity is what an individual can still do despite his or her limitations. SSR 96-8p, 1996 WL 374184, at *2 (Jul. 2, 1996). An RFC is an assessment based upon all of the relevant evidence, such as:

- medical history;

- medical signs and laboratory findings;

- the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment;

- reports of daily activities;

- lay evidence;

- recorded observations;

- medical source statements;

- effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment;

- evidence from attempts to work;

- need for a structured living environment; and

- work evaluations, if available.

Id. at *5. The determination of a claimant's RFC is reserved to the ALJ, whose decision will be upheld so long as it is supported by substantial evidence. See 20 C.F.R. § 404.1527(e); Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

The two State Agency physicians that examined Plaintiff's medical history, Dr. Gomez and

Dr. Lambrechts, both determined that Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk for at least 2 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (R. at 444-51, 479-86) Both Dr. Gomez and Dr. Lambrechts determined that Plaintiff could stand for 2-3 hours in an 8-hour workday. (R. at 445, 480) The ALJ afforded these opinions significant weight, and his RFC assessment is consistent with their opinions. (R. at 33, 36) Plaintiff's medical history is consistent with the state agency opinions, indicating that she can perform a full range of activities:

> At last examination by a specialist, the claimant's joint replacements were all well aligned and doing well. (Exhibit 1F) In January 2007, the claimant's neurosurgeon reviewed her post-operative magnetic resonance imaging (MRI) of her cervical spine, finding no significant problems and releasing the claimant to full activity. (Exhibit 6F) By the time the claimant applied for benefits in April 2007 . . . the claimant had been released to full activity by her neurosurgeon and there we no restrictions of record from her orthopedic specialists. . . . The claimant's artificial hip dislocated within a month after her replacement surgery in 2005 (Exhibit 1F), but there is no further indication of any instability in the joint. (Exhibit 1F). The claimant had a recent dislocation of that hip in January 2009, but that was the result of what the doctor called a "violent fall" rather than from an inherent instability in the joint. (Exhibit 22F, 25F).

(R. at 34) Plaintiff's testimony about her daily activities also supports the conclusions of the agency physicians; at the hearing, Plaintiff testified that she spends 2-3 hours on her feet each day, performs daily chores in her home and on her farm, goes shopping, attends meetings as the mayor of Camden-on-Gauley and as a member of the town's water and sewer boards, and attends church. (R. at 34-35) All of the above evidence is consistent with the RFC assessment made by the ALJ, and thus the undersigned Magistrate Judge finds that substantial evidence supports his RFC finding. See Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984) ("[W]e have also ruled that the testimony of a non-

examining physician can be relied upon when it is consistent with the record."). Furthermore, the undersigned Magistrate Judge finds no error in the hypothetical posed by the ALJ because his assumption of an RFC capable of sedentary work is supported by substantial evidence. See Fisher v. Barnhart, 181 Fed.App'x 359, 365 (4th Cir. 2006) (not selected for publication) ("Because the ALJ's residual-functional-capacity determination is supported by substantial evidence and because the challenged hypothetical question merely incorporated that determination, the ALJ committed no error.").

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for Supplemental Security Income. Accordingly, I recommend that Plaintiff's Motion for Summary Judgment (ECF No. 19) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, and the Decision of the Administrative Law Judge be **AFFIRMED** because:

1.      substantial evidence supports the ALJ's conclusion that Plaintiff does not meet the requirements of Listing 1.03 because she can walk without use of an assistive device that limits the function of both upper extremities;

2.      the ALJ's failure to specifically discuss Listing 1.04 was harmless because Plaintiff concedes that her condition does not meet the requirements of the listing;

3.      the ALJ did not need to specifically address Plaintiff's obesity at Step Three because substantial evidence supports the ALJ's conclusion that Plaintiff can ambulate

effectively;

4.     the ALJ properly applied SSR 96-7p in making his credibility determination and that determination is supported by substantial evidence;

5.     the ALJ properly weighed the opinions of Dr. Trenbath as required by SSR 96-5p; and

6.     substantial evidence supports an RFC finding that Plaintiff can perform sedentary work because the ALJ's RFC determination is consistent with the evidence and the opinions of the State Agency physicians.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **29th** day of **September**, **2010**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE